Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZACHARY MADELL, | Case No: |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| TELENAV, INC., DOUGLAS MILLER, H.P. JIN, SAMUEL CHEN, WES CUMMINS, and RANDY L. ORTIZ, | |
| Defendants. | |

### COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Zachary Madell ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### NATURE OF THE ACTION

1.      This is an action against Telenav, Inc. ("Telenav" or the "Company"), and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection

with the proposed acquisition (the "Proposed Transaction") of Telenav by V99, Inc. ("V99") and

Telenav99, Inc. ("Merger Sub"), a wholly owned subsidiary of V99.[1]

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of

the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the

SEC (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of

the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs

complained of herein had an effect in this District, the alleged misstatements entered and the

subsequent damages occurred in this District, and the Company maintains offices in New York

City.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mails, interstate telephone communications and the

facilities of the national securities exchange.

## PARTIES

6.      Plaintiff is, and has been at all relevant times hereto, an owner of Telenav common

stock.

---

[1] V99 is a Delaware corporation led by Defendant H.P. Jin, Co-Founder, Chairman of the Board, President and Chief Executive Officer ("CEO") of Telenav.

2

7.      Defendant Telenav, together with its subsidiaries, provides connected car and location-based platform services in the United States and internationally. The Company is incorporated in Delaware and maintains offices in New York City. The Company's common stock trades on the NASDAQ Global Select Market under the ticker symbol, "TNAV."

8.      Defendant Douglas Miller ("Miller") is a director of the Company.

9.      Defendant H.P. Jin ("Jin") is Co-Founder, Chairman of the Board, President and CEO of Telenav.

10.     Defendant Samuel Chen ("Chen") is a director of the Company.

11.     Defendant Wes Cummins ("Cummins") is a director of the Company.

12.     Defendant Randy L. Ortiz ("Ortiz") is a director of the Company.

13.     Defendants Milller, Jin, Chen, Cummins, and Ortiz are collectively referred to herein as the "Individual Defendants."

14.     Defendants Telenav and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  The Proposed Transaction

15.     On November 3, 2020, Telenav issued a press release announcing that it had entered into a definitive merger agreement to be acquired by V99 for $4.80 per share in an all-cash transaction. The press release states, in pertinent part:

**Telenav Enters into Definitive Agreement to be Acquired by V99 in "Go Private" Transaction**

*Telenav Stockholders to Receive $4.80 Per Share in Cash*

*Transaction Provides Compelling Value to Stockholders*

November 03, 2020 07:30 AM Eastern Standard Time

SANTA CLARA, Calif.--(BUSINESS WIRE)--Telenav, Inc. (NASDAQ: TNAV), a leading provider of connected-car and location-based services, today announced that it has entered into a definitive merger agreement to be acquired by V99, Inc., a Delaware corporation led by HP Jin, Co-Founder, President, and Chief Executive Officer of Telenav, for $4.80 per share in an all cash transaction that values Telenav at approximately $241 million. HP Jin, Samuel T. Chen, a director of Telenav, and a certain entity affiliated with Mr. Chen, are expected to provide debt financing in connection with the proposed transaction.

\*       \*       \*

"Today's announcement represents an exciting new chapter for Telenav," said HP Jin, Co-Founder, President and Chief Executive Officer. "As a private company, we will have the resources and flexibility to continue our growth and execute on our OEM-centric, connected-car strategy as the market for connected-car capabilities continues to expand. I would like to thank the Special Committee for taking the time to thoroughly evaluate and review V99's offer and Telenav's employees for their continued focus throughout this process. I am honored to continue leading Telenav through its next phase of growth and success, and I am confident Telenav will thrive as a privately held company."

**Transaction Details**

Acting upon unanimous recommendation by the Special Committee, the Telenav Board of Directors unanimously approved the merger agreement and the merger, with Messrs. Jin and Chen recusing themselves from all related discussions and abstaining from the vote. The Special Committee negotiated the terms of the merger agreement with assistance from its independent financial and legal advisors.

The agreement includes a 30-day "go-shop" period expiring on December 2, 2020, which permits the Special Committee and its advisors to solicit alternative acquisition proposals from third parties. The Special Committee will have the right to terminate the merger agreement to enter into a superior proposal subject to the terms and conditions of the merger agreement. There can be no assurance that this "go-shop" will result in a superior proposal, and Telenav does not intend to disclose developments with respect to the solicitation process unless and until it determines such disclosure is appropriate or otherwise required.

Additionally, Messrs. Jin and Chen, Changbin Wang, and each of their affiliates and related parties, have executed a voting and support agreement with the Company, pursuant to which, among other things, such parties have agreed to vote their shares of Telenav stock in accordance with the recommendation of the Special Committee or the Telenav Board of Directors with respect to the merger agreement and the merger and to otherwise support any proposal that the Special Committee or the Telenav Board of Directors receives prior to the expiration of the "go-shop" period, and determines is a superior proposal and provides an appropriate notice to

V99 on or prior to December 16, 2020, including by voting or tendering their shares of Telenav stock in accordance with the recommendation of the Special Committee or the Telenav Board of Directors, as applicable, with respect to such superior proposal.

The transaction is expected to close during the first calendar quarter of 2021, subject to customary closing conditions, including approval by Telenav stockholders, approval by Telenav stockholders holding a majority of the outstanding shares owned by stockholders other than Mr. Jin, Mr. Chen, Changbin Wang, and each of their affiliates and related parties, and receipt of regulatory approvals. Upon closing of the transaction, Telenav common stock will no longer be listed on any public market. Telenav will continue to be headquartered in Santa Clara, California.

*       *       *

**Advisors**

B. Riley Securities, Inc. and Wilson Sonsini Goodrich & Rosati, P.C. are serving as financial advisor and legal advisor, respectively, to the Telenav Special Committee. Norton Rose Fulbright LLP is serving as legal advisor to V99, Inc.

**About Telenav, Inc.**

Telenav is a leading provider of connected car and location-based services, focused on transforming life on the go for people - before, during, and after every drive. Leveraging our location platform, we enable our customers to deliver custom connected car and mobile experiences. To learn more about how Telenav's location platform powers personalized navigation, mapping, big data intelligence, social driving, and location-based advertising, visit www.telenav.com.

16.     On January 8, 2021, Defendants caused to be filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") under the Exchange Act in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

17.     The Proxy Statement, which recommends that Telenav shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Telenav's financial projections; (ii) the financial analyses performed by Telenav's Special Committee's financial advisor, B. Riley Securities, Inc. ("B. Riley"), in connection with its fairness

opinion;[2] (iii) potential conflicts of interest involving B. Riley; and (iv) the sales process leading up to the Proposed Transaction.

18.     The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Telenav Special Committee and the Telenav Board of Directors; Purposes and Reasons for the Merger; Fairness of the Merger; (iii) Opinion of Financial Advisor to the Telenav Special Committee; and (iv) Financial Projections.

19.     Unless and until the material misstatements and omissions (referenced below) are remedied before the February 16, 2021 vote on the Proposed Transaction, Telenav shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

**1.   Material Omissions Concerning Telenav's Financial Projections**

20.     The Proxy Statement omits material information concerning Telenav's financial projections.

21.     The Proxy Statement provides that:

In the ordinary course of business, Telenav's management prepared the Fiscal 2021 Plan, as well as the Long Term Financial Model.[3] In October 2020, the Special Committee directed Telenav management to update the Fiscal 2021 Plan and the Long Term Financial Model in order to assist B. Riley in connection with B. Riley's financial analyses and potential acquirors other than V99 in considering whether or not to make a proposal to acquire Telenav. The Special Committee directed Telenav

---

[2] The Special Committee refers to Defendants Miller, Cummins, and Ortiz who were delegated power by the Board to, among other things, evaluate and negotiate the terms of the Proposed Transaction.

[3] More specifically, on October 1, 2020, "[t]he Special Committee . . . discussed the need to prepare an update to Telenav's long-term financial model (the "Long Term Financial Model") and its forecast for the fiscal year ending June 30, 2021 (the "Fiscal 2021 Plan")."

management to prepare two updates—one that assumed that Telenav would secure a next generation program with one of its automobile manufacturer customers (the "Extension Projections") and one that assumed that Telenav would not secure a next generation program with such automobile manufacturer customer (the "No Extension Projections", and together with the Extension Projections, the "Financial Projections").

22.     The Proxy Statement provides tables of the purported Financial Projections.

23.     The Proxy Statement, however, fails to disclose the following concerning the Financial Projections: (1) all line items underlying (i) Operating Profit, (ii) Pro-Forma Net Income, and (iii) Adjusted EBITDA; and (2) a reconciliation of all non-GAAP to GAAP financial metrics.

24.     The Proxy Statement provides that, on October 23, 2020, the Special Committee discussed a "third scenario for Telenav's long-term financial projections," stating in pertinent part:

> Mr. Wahla left the meeting after this discussion and Mr. Manzoor then reviewed and discussed with the Special Committee the assumptions and inputs underlying the third scenario for Telenav's long-term financial projections (in addition to the "Extension Projection" and the "No Extension Projections" as further described in the section "Special Factors—Financial Projections,") that Telenav's management had modeled at the request of the Special Committee (the "Maintenance Projections"). Members of Telenav management reviewed the financial metrics underlying the Maintenance Projections, the impact that various assumptions had had on the Maintenance Projections, and the results of the analysis, including a review of the combined organic and inorganic revenue analysis for the Maintenance Projections.

25.     The Proxy Statement, however, fails to adequately disclose the Maintenance Projections including the quantification of the impact of the assumptions and inputs underlying the Maintenance Projections.

26.     The Proxy Statement further fails to disclose the nature of the Special Committee's discussion on or around September 2020 with Telenav's Chief Financial Officer, Adeel Manzoor, concerning "the need to update Telenav's long-term financial forecast," and its similar discussion held on October 1, 2020. The Proxy Statement fails to disclose what updates were contemplated and how they did or would impact the Financial Projections.

27.     When a company discloses non-GAAP financial metrics in a Proxy Statement, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[4]

28.     The disclosure of the aforementioned information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

29.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

---

[4] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited Jan. 8, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

### 2.   Material Omissions Concerning B. Riley's Analyses

30.     In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by B. Riley.

31.     The Proxy Statement fails to disclose the following concerning B. Riley's "*Selected Companies Analysis*" and "*Selected Transactions Analysis*": (1) the individual inputs and assumptions underlying the multiple range of 7.0x to 9.0x; and (2) the results of B. Riley's analysis of the estimated tax savings attributable to Telenav's net operating losses ("NOL").

32.     The Proxy Statement fails to disclose the following concerning B. Riley's "*Discounted Cash Flow Analysis*": (1) Telenav management's estimates of the impact of Telenav's NOLs; (2) the individual inputs and assumptions underlying the (i) terminal value multiples of 5.5x to 6.5x and of 3.5x to 4.5x, and (ii) discount rates ranging from 15.5% to 20.5%; and (3) the projected free cash flows used in the analysis and all underlying line items.

33.     With respect to B. Riley's "*Premiums Paid Analysis*," the Proxy Statement fails to disclose each transaction and the individual premiums paid therein.

34.     With respect to B. Riley's "*NOL Analysis*," the Proxy Statement fails to disclose the individual inputs and assumptions underlying the discount rates ranging from 16.5% to 19.5%.

35.     The valuation methods, underlying assumptions, and key inputs used by B. Riley in rendering its purported fairness opinion must be fairly disclosed to Telenav shareholders. The description of B. Riley's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Telenav shareholders are unable to fully understand B. Riley's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning Potential Conflicts of Interest Involving B. Riley

36.     The Proxy Statement omits material information concerning potential conflicts of interest involving B. Riley.

37.     The Proxy Statement provides that "B. Riley may become entitled to an additional fee in connection with the solicitation of third party indications of interest in acquiring Telenav following the execution of the Merger Agreement." The Proxy Statement, however, fails to disclose the amount or range of the "additional fee," including whether and under what circumstances B. Riley will be paid such fee in connection with its engagement.

38.     The Proxy Statement provides that:

B. Riley and its affiliates in the past provided, and may in the future provide, investment banking and other financial services to Telenav and certain of its affiliates, for which B. Riley and its affiliates have received, or would expect to receive, compensation, including, during the past two years, having provided financial advisory services to Telenav in connection with contemplated acquisition opportunities as well as financing alternatives for which B. Riley and its affiliates have not received any compensation (other than reimbursement of out-of-pocket expenses), but may in the future. B. Riley and its affiliates may in the future provide investment banking and other financial services to V99 and certain of its affiliates, for which B. Riley and its affiliates would expect to receive compensation.

39.     The Proxy Statement, however, fails to disclose: (i) the timing and nature of the services provided by B. Riley and its affiliates to Telenav and/or its affiliates and the amount of compensation expected to be received by B. Riley for providing such services; and (ii) whether B. Riley has provided past services to V99 and/or its affiliates, and if so, the timing and nature of the services provided and the amount of compensation received or expected to be received by B. Riley for providing such services.

40.     Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of

a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

41.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 4.  Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

42.     The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

43.     The Proxy Statement provides that, at the direction of the Special Committee, B. Riley contacted numerous parties during the "'go-shop' period," stating in pertinent part:

> On November 3, 2020, at the direction of the Special Committee, B. Riley began contacting additional potential counterparties to an alternative transaction proposal with Telenav in connection with the "go-shop" period. During the "go-shop" period, which expired at 11:59 p.m. (Pacific Time) on December 2, 2020, B. Riley contacted 39 third parties, of which 16 were strategic parties and 23 were financial sponsors. No third party first contacted by B. Riley during the "go-shop" period entered into a non-disclosure agreement or made a proposal to acquire Telenav prior to the expiration of the "go-shop" period.

44.     The Proxy Statement, however, fails to disclose whether Telenav executed any non-disclosure or confidentiality agreements with *any* third parties during the go-shop period, including whether such agreements contained standstill provisions with "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that would preclude any counterparties from making a superior offer for the Company.

45.     Without this information, Telenav shareholders may have the mistaken belief that potential buyers were or are permitted to submit superior proposals for the Company, when in fact they were or are contractually prohibited from doing so. This information is material because a reasonable Telenav shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior

proposal.

46.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

49.     Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

50.     The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

51.     By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

52.     Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

53.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

54.     The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

55.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

56.     In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged

herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of certain Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

57.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

58.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

59.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B.      In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D.      Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 8, 2021                                    Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com
        zhalper@halpersadeh.com

*Counsel for Plaintiff*